Lennie Belle DOMINY, Appellant,

v.

B. L. DOMINY, Appellee.

No. 13124.

Court of Civil Appeals of Texas.

Houston.

Sept. 12, 1957.

Rehearing Denied Oct. 10, 1957.

O. R. Kenley, H. C. Davidson, Houston, for appellant.

Thos. E. Lichenstein, Houston, for appellee.

GANNON, Chief Justice.

The appellant, Lennie Belle Dominy, the surviving widow and sole heir-at-law of S. C. Dominy, also known as Carroll Dominy, brought this suit on November 9, 1956, against her brother-in-law, B. L. Dominy, as defendant, to try the title to Lots 13, 14 and 15, in Block 44 of Rice Military Addition to the City of Houston, Harris County. The subject property is improved with a dwelling house and with an additional structure which has been used from time to time as a broom factory. Plaintiff Lennie Belle Dominy relies solely upon the 10 year statute of limitation. The record indicates at one point a claim of a lost deed from B. L. Dominy and wife to Carroll Dominy, but at the trial Mrs. Dominy ex-

pressly abandoned claim of title under the deed.

It is undisputed that defendant B. L. Dominy is the record owner, he having purchased the property on March 20, 1922, from A. W. Wells and wife, Carrie Wells, for the sum of $1,000, of which $400 was paid in cash, with a deferred balance of $600. The deed from Wells and wife to B. L. Dominy, as well as the release of the vendor's lien, is in evidence and undisputed. It is recited in the deed that at the time Dominy received his conveyance the property was improved with a dwelling house.

Trial was to the court without a jury and resulted in a judgment in favor of the record owner, defendant B. L. Dominy, from which Lennie Belle Dominy appeals on three points of error. By two of these she complains of the want of any evidence to support the judgment in favor of defendant, and asserts that "all the evidence of probative force showed that appellant had perfected a legal title to the property under the ten year statute of limitation"; that is to say, that the evidence below was such as to compel a judgment in her favor. By another point Mrs. Dominy complains of the admission in evidence over her objection of certain testimony of defendant which she claims related to a transaction with her deceased husband, defendant not having been called by Mrs. Dominy "thereto". The basis of the complaint is that the court's action in admitting the testimony was violative of Article 3716, Vernon's Ann.Tex.St., familiarly known as the Dead Man's Statute.

A careful and painstaking study of the record and the pertinent decisions has convinced us that but for the admission of the testimony complained of the evidence presents only a fact and not a law issue on limitation. However, we are persuaded that the evidence complained of was erroneously admitted and that on the record before us its admission was reversible error.

As briefly stated as may be for an adequate understanding of our views, the material record shows the following:

It is undisputed that after B. L. Dominy's purchase of the property he and his brother, Carroll, lived on it together with their mother and father up until 1924 when the defendant B. L. Dominy married. After his marriage in 1924 B. L. Dominy moved from the property and made his home elsewhere. However, the mother and father and Carroll continued to occupy the premises up until the year 1927, when the senior Dominy died. Carroll and the mother Mrs. Betty Dominy, continued in possession after the senior Dominy's death. Carroll Dominy married in December of 1927 and his wife, the plaintiff Lennie Belle Dominy, then moved onto the property with Carroll and his mother. She and her husband and the senior Mrs. Dominy continued to occupy the property as a home until 1943. From the date of Lennie's marriage she and her husband, Carroll, engaged in the manufacture of brooms on the premises, but in 1934 Carroll and Lennie discontinued this enterprise. In 1934 Carroll Dominy rented the "broom factory" located on the back of the premises to Emil Nentwig. Rents on the broom factory were collected by Carroll Dominy from Emil Nentwig up until 1943. At that time Carroll and Lennie Dominy purchased a home in Houston Heights, to which they removed, taking Carroll's mother with them. Simultaneously they rented the entire premises to Nentwig, who continued to pay rent to Carroll Dominy until 1946 when Nentwig moved off, leaving his daughter and son-in-law, Mr. and Mrs. W. D. Mabry, on the place. All arrangements for Mr. Nentwig's tenancy were made by Carroll Dominy and all rents were collected and received by him. Asked specifically if during his occupancy Mr. Carroll Dominy claimed to be the owner of the property, Nentwig testified in substance that the matter of ownership never came up and that the matter was therefore never mentioned. Mr. Nentwig testified that during his occupancy "substantial repairs were made by Carroll Dominy". When Mr. Nentwig moved away Mr. and Mrs. Mabry continued occupying the premises, renting directly from Carroll Dominy and paying the rents to him. After about six months Mrs. Betty Dominy, the mother, desired to move back to the subject property and Carroll Dominy made arrangements with Mabry for her to occupy one of the back rooms and for her use of the kitchen, Mabry to continue to occupy the rest of the premises at a reduced rental. Mrs. Betty Dominy then moved in and continued in conjunction with others to live in the house on the property until about a year before her death which occurred in 1955. The Mabrys moved out in 1947.

Plaintiff's witness, R. C. Poston, testified that he lived next door or on adjacent property, at 217 South Knox Street, from 1923 to 1935, during which time he was well acquainted with the plaintiff, Lennie Belle Dominy, and her deceased husband, Carroll Dominy. This witness testified that during this period Carroll Dominy and his wife were living on the subject property and that on "several occasions" they claimed to own it.

Mr. Cleveland Dominy, a cousin of Carroll and of defendant B. L. Dominy, testified that in May of 1947 he moved onto the property, renting it from Carroll Dominy at $5 a week; that he occupied the property until July of 1948; that Carroll Dominy died in November of 1947; that after Carroll Dominy's death, he paid his rent to the mother, Mrs. Betty Dominy; that this was because Carroll Dominy's surviving widow, the plaintiff, instructed him to do so; that through the "course of time [he] knew him on various occasions" Carroll Dominy claimed to him, Cleveland Dominy, to own the property. This witness explained that Carroll Dominy rented him the property at a very low rate in consideration of Mrs. Betty Dominy being permitted joint occupancy, kitchen facilities, and on account of Cleveland

Dominy and wife being there to look after her.

Mrs. Lennie Bell Dominy testified to facts to show herself the sole heir-at-law of her deceased husband, Carroll Dominy; that during her marriage all rents on the subject premises were collected by and paid to her husband, Carroll Dominy, during his lifetime, that is, up until November, 1947. She corroborated Cleveland Dominy's testimony that following her husband's death she instructed Cleveland Dominy to pay the rents to Mrs. Betty Dominy, explaining that she felt the old lady needed these to supplement her pension. Additionally, the witness testified she arranged with Betty Dominy as her tenant for her, Betty Dominy to occupy the place and have any rent on it she might be able to collect as long as she lived. Mrs. Lennie Belle Dominy testified that from the time she moved onto the property, in fact during all of their married life, she and her husband "claimed to be the owner of the property" and that during the whole of this time and later either her husband Carroll or she paid the taxes on the property.

A certificate of the Harris County Tax Collector, admitted in evidence without objection, shows the payment of taxes for the years indicated as follows: 1923 and 1924, B. L. Dominy; 1925 to 1947, both dates inclusive, a period of twenty-three consecutive years, S. C. (Carroll) Dominy. The certificate shows that in 1948 a double payment of the taxes on the property was made, one by Mrs. Lennie Dominy, the other by B. L. Dominy; that during 1949 to 1952, both dates inclusive, Mrs. Lennie Dominy alone paid the taxes. The certificate shows that for the years 1953 and 1954 defendant B. L. Dominy paid the taxes and that for the years 1955 and 1956 they were paid by Mrs. Lennie Dominy.

Plaintiff Lennie Dominy introduced various expired insurance policies showing that Carroll Dominy had insured the property in his own name against fire for three year periods, as follows: $1,200, March 24, 1931, to March 24, 1934; $1,200, March 24, 1937, to March 24, 1940; $1,200, March 24, 1940, to March 24, 1943; $1,500, March 24, 1943, to March 24, 1946; $1,500, March 24, 1946, to March 24, 1949.

Mrs. Lennie Dominy testified that substantial repairs were made on the property, including reroofing, by her husband and later by herself, from 1927 forward. Plaintiff also testified that at no time from 1927 forward did either she or her husband ever recognize a claim of ownership to the property in anyone else and that her first knowledge that the defendant B. L. Dominy was making a claim to the property was in July of 1955, at Mrs. Betty Dominy's funeral, though she stated that after her husband's death in 1948, but not at her instance or request, "they" made a request of B. L. Dominy to convey the property to her. The plaintiff further testified that B. L. Dominy had never made demand upon either her or her husband for any rents collected from the premises. Asked if she and her husband just moved in, rent free, the witness answered: "It was my house, the property was mine and my husband's." It was developed on cross-examination that in 1929 she had seen a deed to the property executed by defendant, Lehman Dominy, and wife, Lucille, presumably to her husband, and said, "We had a deed from Lehman (the defendant) and his wife in consideration of his part of the property, in 1929." The witness explained her absence of technical reliance upon the deed by the fact that she did not have it, and "What could I say?" The witness explained her failure to collect the rents after Mrs. Betty Dominy was taken to the sanitarium, a period of over a year prior to her death, on the ground that she had promised these to Mrs. Dominy for life. The witness explained her payment of the taxes by herself and husband, despite the fact the record title was in B. L. Dominy, thus: "It was our own property," and denied that either she or her

husband ever had an agreement with defendant, B. L. Dominy, "in our lives about nothing". After testifying on cross-examination without objection to the 1929 deed of B. L. Dominy, at a later point in the proceedings and on redirect examination, her further testimony in respect to the contents of the instrument was objected to as hearsay. The court sustained the objection, announcing that he would permit the defendant to withdraw his announcement of ready if called on to permit further proof of the deed. At this point plaintiff agreed to try her case "purely upon the limitation title". Plaintiff's counsel phrased his abandonment of reliance on the deed as follows: "Any ground of recovery *on the lost instrument*" from which the court stated he understood that plaintiff was "abandoning *any title* under a lost instrument". (Emphasis supplied) We observe here that a claim of title under a lost instrument is a different thing from proving the contents of a lost instrument in explanation of assertion of title by adverse possession. One who thinks he at one time had a deed to property might very well not be in position sufficiently to prive its contents—its acknowledgment, if homestead, etc.—in such a way as to establish title under it, still such good faith belief, without more, would tend to explain, corroborate and bolster up a claim of right under the ten year statute. We think it important that the court did not strike from the record the evidence in respect to the claim of a lost instrument which was elicited by defendant on cross-examination and not objected to by plaintiff, but that he at a later point only refused to permit plaintiff to go further into it, and this on the theory that she could not claim *title* under the instrument without due procedural notice of such claim to defendant.

Defendant was the only witness to testify in his behalf. He apparently relied principally upon the supposed weakness of plaintiff's case and his own record title. He testified without objection that after his purchase of the place in 1922, he occupied it until his marriage in 1924, during which time his brother Carroll and his mother and father lived with him, they remaining on the premises after he moved away following his marriage. Asked who lived there after he moved away, witness answered, "My mother and daddy and brother Carroll" and then volunteered "and we had an agreement," at which point plaintiff's counsel interrupted the witness, where upon the following occurred:

"Mr. Davidson: We object to any agreement, it is not in response to any question, and it is in violation of the Dead Man's Statute.

"Mr. Lichenstein: That wasn't the question asked, but we are going to have to refer to an agreement, we have testimony that they had an agreement, that there was an agreement that they would support the mother and not charge her rent.

"The Court: This is not a suit against the administratrix of the estate, this is a suit brought by her, she is suing somebody else.

"Mr. Davidson: She testified that she was the sole heir of the deceased, Carrol Dominy, and we have introduced the order of the Probate Court so finding."

(At this time arguments were presented to the Court)

"The Court: My ruling will be you cannot prove or have this witness testify to anything said to or by his brother, but this witness may testify and you may prove what basis he turned the property over to his brother, but not any statements of what his brother may have said to him during his lifetime.

"Q. It has been your testimony that you occupied these premises with your brother and your mother and your

father up until you married in 1924?
A. Yes, sir.

"Q. At which time you left? A. Yes, sir.

"Q. State whether or not you had made any arrangements *with your brother* as to his continued use and occupancy of the premises, without stating what had been said? (Emphasis supplied)

"Mr. Davidson: We object to any testimony about any transaction with his deceased brother because it is in violation of the Dead Man's Statute, Article No. 3716.

"The Court: I overrule the objection.

"Mr. Davidson: Note our exception. A. What was your question again?

"Mr. Lichenstein: I will ask the court reporter to read my last question.

"Q. (Read by the reporter) State whether or not you had made any arrangements with your brother as to his continued use and occupancy of the premises, without stating what had been said? A. I did.

"Q. What was that arrangement?

"Mr. Davidson: We urge our objection that any testimony with reference to any arrangements *with his brother,* Carrol Dominy, would be in violation of the Dead Man's Statute, Article 3716. (Emphasis supplied)

"The Court: I overrule the objection.

"Mr. Davidson: Note our exception. A. When I left, my mother and father and my brother were there, and so long as my mother and father were taken care of and had a roof over their heads, there would be no

rent paid me so long as they paid the taxes on the place.

"Q. Who was to attend to the upkeep of the place?

"Mr. Davidson: We object to that as being testimony concerning a transaction with a deceased person and is in violation of the Dead Man's Statute, Article No. 3716.

"The Court: I overrule the objection.

"Q. Who was to take care of the upkeep on the place? A. My brother, Carrol Dominy.

"Q. Did you have occasion from time to time during the occupancy of the premises by your brother and any other parties, to go around the place from time to time? A. I visited it quite often.

"Q. Do you know when your brother and sister-in-law left there? A. No, sir, I don't know what year they did leave there.

"Q. Did you know they were gone? A. Yes, sir.

"Q. Had you made any different arrangements, other than the original arrangement?

"Mr. Davidson: We object because that would be in violation of the Dead Man's Statute, it is in reference to a transaction with a deceased party.

"The Court: I overrule the objection. A. No different arrangement, but when the place was rented. * * *

(Interrupted)

Following the foregoing proceedings the witness testified that after his brother's death on November 24, 1947, he took over and that after he took over in 1947 and that in that year and while his mother still continued on in the house, he rented the property and used the rents to help

support his mother and make repairs on the house, reroofing and repapering it and installing a water heater. Defendant testified he rented the house for $25 per month until his mother was taken sick and went to the hospital, after which time he rented the entire house for $35 a month.

Defendant introduced tax statements showing his payments of State and County taxes in his own name for the years 1948, 1953 and 1954, but he also introduced certain tax statements showing payment of City and School District taxes for the years 1948, 1949, 1951, 1952, and 1953. The tax statements show that in 1948, the year following Carroll's death, the City and School District taxes were assessed against B. L. Dominy, but in 1949, 1951 and 1952 against Mrs. Lennie Dominy, though in 1953 according to the tax statements introduced by the defendant the property was assessed in the name of B. L. Dominy.

The foregoing comprehensive statement shows the material particulars of the record on which we rule.

■■■ Appellant's point that the evidence was insufficient to support a judgment for defendant is not well taken. In trespass to try title one must rely upon the strength of his own title, not the weakness of that of his adversary. Nor do we think the evidence, as contended by appellant, compelled a judgment in her favor. However, we do feel that independently of the testimony of defendant complained of by plaintiff, the case was a close one on the facts. We are not unaware that where, as here, a claimant's original entry and holding is with the permission of the record owner and in subordination to his title, it is required, in order to set the statute in motion, that one claiming title by adverse possession show his repudiation of the owner's title and either actual or constructive notice thereof to the record owner. But it is not necessary that actual notice be proved, "Possession and assertion of exclusive ownership may be so notorious and long continued as to constitute

notice." 2 Tex.Jur., Adverse Possession, Sec. 77, page 150. Facts which, among others, tend to establish constructive notice of a tenant's repudiation of his lessor's title are prolonged and exclusive occupancy and possession under a claim of right notoriously asserted, the making of repairs and the payment of taxes. Idem. In our opinion, plaintiff's case was entirely sufficient to raise fact issues in respect to all the elements requisite under the ten year statute. Dickens v. Dickens, Tex. Civ.App., 241 S.W.2d 658; Cox v. Cox, 134 Va. 307, 114 S.E. 672; 2 C.J.S. Adverse Possession § 87(b) cc, p. 643.

Considering defendant's failure in his testimony to negative certain permissible inferences from plaintiff's proof, particularly his want of any notice or knowledge of an adverse claim, especially when he was in position to do so, we think it clear that the case is one where the evidence complained of was of much potential cogency and calculated to weigh heavily against plaintiff and in favor of defendant. That it was devastating of plaintiff's case if believed by the trial court and taken into account by him in arriving at his conclusions on plaintiff's proof, is hardly debatable.

■■ We are clear in the conviction that the evidence was incompetent and inadmissible. Article 3716 was plainly applicable and apparently the trial court so ruled. While the trial court correctly felt that plaintiff, being an heir of Carroll Dominy, made the statute applicable in so far as testimony concerning a transaction with decedent was concerned, in our opinion he erred in his conclusion that the testimony of B. L. Dominy about the arrangement with his dead brother did not necessarily imply a transaction with the deceased. Defendant categorically testified that his dead brother was to take care of the upkeep of the place and in hardly less express language to an offer on the part of the defendant to the dead brother that so long as the dead brother took care of the mother and father and paid the taxes on the place he

could have it without paying any rent. We do not think this could be anything but a transaction with decedent.

■ As to the applicability of the statute—this was a case in which judgment might be rendered for or against plaintiff in her status and capacity as heir of her deceased husband. The fact that judgment could also be rendered against her in another capacity, that is, in so far as she asserted her own claim of a one-half interest acquired during the existence of the community, does not render the statute inapplicable. See McCormick and Ray, Texas Law of Evidence, Sec. 325, p. 281, where it is said, "On the other hand, where a party sues in his individual right as well as in his representative capacity and the interests are not severable, the statute applies and neither party may testify as to transactions with the decedent." Spencer v. Schell, 107 Tex. 44, 173 S.W. 867, is the source of the text. We think that case fully supports it. Adverting to our view that the testimony of the defendant, admitted over the objection of plaintiff, constituted a transaction with the deceased, see Black's Law Dictionary, 3d edition, p. 1747, where it is said:

"A 'transaction' between a witness and a decedent, within statutory provisions excluding evidence of such transactions, embraces every variety of affairs which can form the subject of negotiations, interviews, or actions between two persons, and includes every method by which one person can derive impressions or information from the conduct, condition or language of another."

See also McCormick and Ray, Texas Law of Evidence, Sec. 329, page 291, reading: "It is usually said that the test is whether if the witness offered should testify falsely, deceased, if living, could controvert it of his own personal knowledge."

■ In a fact case such as this, where but for the erroneous admission of evidence, it would be our clear duty to affirm and the trial is before the court without a jury, ordinarily the presumption obtains that the court disregarded evidence improperly admitted and that he based his judgment solely on competent, admissible proof. But the presumption is not a conclusive one. See Moore v. Kennedy, 81 Tex. 144, 16 S.W. 740. The governing canon has been recently stated in an opinion by the Austin court, Wooten v. Clark, Tex.Civ.App., 276 S.W.2d 391, 394, as follows: "The true rule in such cases is that where the issue is close and it is apparent from the record that the evidence improperly admitted might have influenced the judgment the case should be reversed." It is made clear in the same opinion that where improper evidence is received without objection or when after being received over objection the trial court reverses himself and rules differently or in some other way indicates he did not rely on such evidence, or in the light of the entire record the evidence is of slight weight, the trial court's fact findings will be allowed to stand. In the present appeal we feel that the testimony, which we have ruled incompetent, not only might have influenced the judgment in the case but that the probability is that it did so.

■ Though not formally assigned as error, we note from the statement of facts that the court rejected plaintiff's offer of proof of the general reputation of ownership in the neighborhood of the property in question "from 1923 until 1935". The evidence was not offered in proof of actual title or actual ownership but solely as a circumstance to show plaintiff's assertion of a claim of right and its notoriety. On a retrial we suggest that the trial judge give consideration to McCormick and Ray, Texas Law of Evidence, 2d Ed., page 174, reading in part as follows: "In a number of instances general reputation in the neighborhood as to the ownership of property at the time in question has been received. This is especially true where the issue is as to whether a person had knowl-

'edge of such 'ownership or claim of ownership." Our own prior ruling in Carlisle v. Gibbs, 57 Tex.Civ.App. 592, 123 S.W. 216, 219, would indicate the admissibility of evidence of general reputation of ownership for the limited purpose of showing the notoriety of a claim of right.

The case will be reversed and remanded ·for new trial.

Reversed and remanded.

WOODRUFF, J., not sitting.